**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

BRIAN GROFF,

                                        Plaintiff,

          - v -                                        Civ. No. 7:05-CV-54
                                                            (NAM/RFT)

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

**APPEARANCES:**                              **OF COUNSEL:**

CONBOY, McKAY LAW FIRM                        LAWRENCE D. HASSELER, ESQ.
Attorney for Plaintiff
307 State Street
Carthage, New York 13619

HON. GLENN T. SUDDABY                         WILLIAM H. PEASE
United States Attorney for the Northern District of NY    Assistant United States Attorney
Attorney for Defendant
P.O. Box 7198
100 South Clinton Street
Syracuse, New York 13261

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

## REPORT-RECOMMENDATION and ORDER

     In this action, Plaintiff Brian Groff moves, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), for

review of a decision by the Commissioner of Social Security denying his application for Supplemental

Security Income (SSI).[1]   Based upon the following discussion, this Court recommends that the

Commissioner's decision denying Social Security benefits be **vacated and remanded**.

---

[1] This case has proceeded in accordance with General Order 18, which sets forth the procedures to be followed when appealing a denial of Social Security benefits. Both parties have filed Briefs, though oral argument was not heard. Dkt. Nos. 6 & 10. The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

# I. BACKGROUND

## A. Facts

Born on August 20, 1960, Brian Groff was forty-two years old when he filed for disability benefits.  He completed the ninth grade and has previously worked as a municipal equipment operator, construction laborer, and a painter.  Groff alleges an inability to work due to emphysema, severe migraine headaches, and arthritis. Dkt. No. 5, Admin. Tr. [hereinafter "Tr."] at pp. 12 & 87.  The facts set forth in Groff's Brief under the heading "Statement of the Case" are adopted.  Dkt. No. 6, Pl.'s Br., at pp. 1-8; *see also* Dkt. No. 10, Def.'s Br., at p. 2 (incorporating Plaintiff's summary of the medical and other evidence with the exception of any inferences or conclusions asserted therein).

## B. Procedural History

On September 30, 2002, Groff protectively filed for SSI alleging a disability onset date of September 30, 2002.[2]  Tr. at pp. 12-13 & 72-77.  The application was denied initially.[3]  *Id.* at pp. 49-50 & 53-56.  On June 4, 2004, a Hearing was held before Administrative Law Judge (ALJ) Javier Arrastia (Tr. at pp. 23-48), who, on September 28, 2004, issued an unfavorable decision against Groff (Tr. at pp. 12-21).  On December 30, 2004, the Appeals Council concluded there was no basis under the Social Security Regulations to grant Plaintiff's request for review, thus rendering the ALJ's decision the final determination of the Commissioner.  *Id.* at pp. 4-10.  Having exhausted all options for review through

---

[2] Plaintiff initially filed for Disability Insurance Benefits (DIB), Period of Disability Benefits (POD), and SSI Benefits, alleging a disability onset date of May 1, 1990.  *See* Tr. at p. 72.  In light of the paucity of medical records dating back to 1990, and because for DIB and POD purposes Groff was insured only through December 31, 1990, Plaintiff's counsel stipulated at the Administrative Law Judge Hearing to the dismissal of his DIB and POD applications.  *See* Tr. at 12-13.  He further stipulated to amend the onset disability date to September 30, 2002, the protective filing date of his SSI application.  *Id.*  Thus, the ALJ's decision, and this Court's review thereof, pertains only to a determination of whether Plaintiff is eligible for SSI payments.  *Id.*  For all intents and purposes, aside from an additional economic eligibility element, the standards for awarding disability benefits are the same whether it be SSI, DIB, or POD.  *See* 42 U.S.C. § 423(d); *see also infra* note 4.

[3] As this matter was a prototype test case, the reconsideration stage was eliminated.  Def.'s Br. at p. 2, n.2.

the Social Security Administration's (SSA) tribunals, Plaintiff now brings this appeal.

## II.  DISCUSSION

### A.  Standard of Review

Under 42 U.S.C. § 405(g), the proper standard of review for this Court is not to employ a *de novo* review, but rather to discern whether substantial evidence supports the Commissioner's findings and that the correct legal standards have been applied.  *See Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *Urtz v. Callahan*, 965 F. Supp. 324, 325-26 (N.D.N.Y. 1997) (citing, *inter alia*, *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  Succinctly defined, substantial evidence is "more than a mere scintilla," it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

The ALJ must set forth the crucial factors supporting the decision with sufficient specificity. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).  Where the ALJ's findings are supported by substantial evidence, the court may not interject its interpretation of the administrative record.  *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); 42 U.S.C. § 405(g).  Where the weight of the evidence, however, does not meet the requirement for substantial evidence or a reasonable basis for doubt exists as to whether correct legal principles were applied, the ALJ's decision may not be affirmed.  *Johnson v. Bowen*, 817 F.2d at 986.

### B.  Determination of Disability[4]

To be considered disabled within the meaning of the Social Security Act, a plaintiff must establish an "inability to engage in any substantial gainful activity by reason of any medically

---

[4] While the SSI program has special economic eligibility requirements, the requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3) (SSI) and Title II, 42 U.S.C. § 423(d) (Social Security Disability Insurance ("SSDI")), are identical, so that "decisions under these sections are cited interchangeably."  *Donato v. Sec'y of Health and Human Servs.*, 721 F.2d 414, 418 n.3 (2d Cir. 1983) (citation omitted).

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore, the claimant's physical or mental impairments must be of such severity as to prevent engagement in any kind of substantial gainful work which exists in the national economy. *Id*. at § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner follows a five-step analysis set forth in the Social Security Administration Regulations.  20 C.F.R. § 416.920.  At Step One, the Commissioner "considers whether the claimant is currently engaged in gainful activity."  *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).  If the claimant is engaged in substantial gainful activity, he or she is not disabled and the inquiry ends.  20 C.F.R. § 416.920(b).  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to Step Two and assesses whether the claimant suffers from a severe impairment that significantly limits his or her physical or mental ability to do basic work activities.  *Id.* at § 416.920(c).  If the claimant suffers from a severe impairment, the Commissioner considers at Step Three whether such impairment(s) meets or equals an impairment listed in Appendix 1, in Part 404, Subpart P of the Regulations.  *Id*. at § 416.920(d).  The Commissioner makes this assessment without considering vocational factors such as age, education, and work experience.  *Berry v. Schweiker*, 675 F.2d at 467.  Where the claimant has such an impairment the inquiry ceases as he or she is presumed to be disabled and unable to perform substantial gainful activity. *Id*.  If the claimant's impairment(s) does not meet or equal the listed impairments, the Commissioner determines the claimant's residual functional capacity (RFC)[5], which is utilized in both Steps Four and

---

[5] "Residual functional capacity" is defined by the Regulations as follows: "Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting.  Your residual functional capacity is what you can still do despite your limitations."  20 C.F.R. § 416.945(a).

Five.  20 C.F.R. § 416.920(a)(4).  At Step Four, the Commissioner determines whether a claimant retains the RFC to perform his or her past relevant work despite the existence of severe impairments. *Id*. at § 416.920(e).  If the claimant cannot perform his or her past work, then at Step Five, the Commissioner considers whether the claimant can perform any other work available in the national economy.  *Berry v. Schweiker*, 675 F.2d at 467; 20 C.F.R. § 416.920(f).

Initially, the burden of proof lies with the claimant to show that his or her impairment(s) prevents a return to previous employment (Steps One through Four).  *Berry v. Schweiker*, 675 F.2d at 467.  If the claimant meets that burden, the burden then shifts to the Commissioner at Step Five to establish, with specific reference to medical evidence, that the claimant's physical and/or mental impairment(s) are not of such severity as to prevent him or her from performing work that is available within the national economy.  *Id*.; 42 U.S.C. § 423(d)(2)(A); *see also White v. Sec'y of Health and Human Servs.*, 910 F.2d 64, 65 (2d Cir. 1990).  In making this showing at Step Five, the claimant's RFC must be considered along with other vocational factors such as age, education, past work experience, and transferability of skills.  20 C.F.R. § 416.920(f); *see also New York v. Sullivan*, 906 F.2d 910, 913 (2d Cir. 1990).

### C. ALJ Arrastia's Findings

Groff, as well as William Hausch, a Vocational Expert, testified at the Hearing.  Tr. at pp. 23-48.  In addition to such testimony, the ALJ had Groff's medical records consisting of treatment reports and opinions from various treating, examining, and/or non-examining physicians, including, 1) Shara Peets, M.D., Treating Physician; 2) Lawrence G. Kramer, M.D., Treating Physician; 3) Kalyani Ganesh, M.D., Consultive Examiner; and 4) J. Koncak, Non-examining State Agency Medical Consultant.  *Id.* at pp. 115-223.

Using the five-step disability sequential evaluation, ALJ Arrastia found that 1) Groff had not engaged in any substantial gainful activity since September 30, 2002, the alleged onset disability date; 2) he has a severe medically determinable impairment, namely emphysema or chronic obstructive pulmonary disease (COPD), but his migraine headaches and arthritis are not severe; 3) his severe COPD  impairment did not meet nor medically equal any impairment listed in Appendix 1, Subpart P of Social Security Regulation No. 4; 4) Groff maintains the RFC to perform a full range of sedentary work and as such, he cannot perform his past relevant work as a municipal equipment operator, construction labor, or painter; but 5) based upon Groff's age, education, prior work experience, and RFC, a finding of "not disabled" was directed by Medical Vocational Guideline Rule 201.24. *Id.* at pp. 12-21.

### D.  Groff's Contentions

Plaintiff contends that the ALJ's decision denying benefits should be remanded or judgment should be granted in his favor because (1) at Step Two, the ALJ should have determined that Groff's migraine and arthritis conditions constituted severe impairments; (2) the ALJ erred in finding Plaintiff had the RFC to perform a full range of sedentary work; (3) the ALJ erroneously applied the Treating Physician Rule and failed to properly consider Plaintiff's credibility; and (4) at Step Five, the ALJ ignored the Vocational Expert's testimony and instead inappropriately relied solely on the Medical Vocational Guidelines, also known as the Grids, to find Plaintiff not disabled. *See generally* Pl.'s Br.

Upon reviewing the Administrative Transcript, this Court has identified some major flaws permeating the ALJ's decision, the most egregious of which is the misapplication of the Treating Physician Rule.  Because of such errors, as explained below, it is recommended that this matter be **remanded** to the Commissioner for further proceedings.

### 1.  Treating Physician Rule

Under the Regulations, a treating physician's opinion as to the nature and severity of a claimant's impairment is entitled to "controlling weight" when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 416.927(d)(2); *see also Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999).[6]  The treating physician doctrine recognizes that a claimant's treating sources, which in most cases are medical professionals, are more apt to "provide a detailed, longitudinal picture of [the patient's] medical impairment(s) and may bring a unique perspective to the medical findings" as opposed to an evaluation of a one-time non-examining, non-treating physician.  20 C.F.R. § 416.927(d)(2); *see Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993).

The first instance of misapplication of the Treating Physician Rule occurred at Step Two when the ALJ determined that Groff's COPD is a severe impairment, but not his migraines nor arthritis. While the assessment of non-severity with regard to the arthritis condition is supported by substantial evidence, the ALJ's assessment of the severity of Groff's migraines is flawed in that he failed to apply the correct legal principles and his conclusion of non-severity is not supported by the administrative record.  The ALJ also misapplied the Treating Physician Rule when he discounted medical opinions rendered by Groff's Treating Physician without first re-contacting that medical source for clarification of her statement.  These errors inevitably tainted the entirety of the sequential evaluation and are grounds for a remand of this matter.

---

[6] A "treating physician" is the claimant's "own physician, osteopath or psychologist (including outpatient clinic and health maintenance organization) who has provided the individual with medical treatment or evaluation, and who has or had an ongoing treatment and physician-patient relationship with the individual." *Jones v. Apfel*, 66 F. Supp. 2d 518, 524-25 (S.D.N.Y. 1999) (quoting *Schisler v. Bowen*, 851 F.2d 43, 46 (2d Cir. 1988)).

### a.  *Step Two–Severe Impairments*

At Step Two of the sequential disability evaluation, the ALJ must decide whether a claimant has a medically determinable impairment or combination of impairments that are severe.  20 C.F.R. § 416.920.  A claimant's treating physician is but one of the many sources who can provide evidence to establish the existence of a medically determinable impairment.  *Id*. at § 416.913.  Other medical evidence needed to establish an impairment include signs, symptoms, and laboratory findings.  *Id*. at §§ 416.908, 416.912, & 416.928.[7]  An impairment is considered severe at Step Two if it significantly limits a claimant's ability to do basic work activities.  *Id*. at § 416.921(a).  The Regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include,

> (1) Physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.

*Id*. at  § 416.921(b); *see also* Social Security Ruling (SSR) 85-28, 1985 WL 56856, at *3-4, *Titles II and XVI: Medical Impairments That Are Not Severe* (S.S.A. 1985).

The Second Circuit has warned that the Step Two analysis may do nothing more than "screen out *de minimis* claims."  *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995) (quoted in *de Roman v. Barnhart*, 2003 WL 21511160, at *11 (S.D.N.Y. July 2, 2003)).  "A finding of 'not severe' should be

---

[7] The Regulations provide definitions of "signs," "symptoms," and "laboratory findings" as follows: *Symptoms* are [a claimant's] own description of [his or her] physical or mental impairment. . . . *Signs* are anatomical, physiological, or psychological abnormalities which can be observed, apart from [a claimant's] statements (symptoms).  Signs must be shown by medically acceptable clinical diagnostic techniques. . . . *Laboratory findings* are anatomical, physiological, or psychological phenomena which can be shown by the use of a medically acceptable laboratory diagnostic techniques[,] . . . includ[ing] chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests. 20 C.F.R. § 416.928 (emphasis in original).

made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" *Rosario v. Apfel*, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting SSR 85-28, 1985 WL 56856, at *3).

Once a medically determinable impairment has been established, an ALJ must assess the functionally limiting effects of a particular impairment through consideration of subjective "symptom-related limitations and restrictions . . ., provided that the individual has a medically determinable impairment(s) that could reasonably be expected to produce the symptoms." SSR 96-3p, 1996 WL 374181, at *2, *Policy Interpretation Ruling Titles II and XVI: Considering Allegations of Pain and Other Symptoms in Determining Whether a Medically Determinable Impairment is Severe* (S.S.A. 1996).

In assessing the severity of Groff's arthritis, the ALJ reviewed Groff's testimony as well as the medical record, which included objective clinical tests, and determined that Groff failed to establish the existence of any "medically determinable and 'severe' arthritis impairment causing more than minimal work-related functional limitations." Tr. at p. 15. This finding is supported by substantial evidence. While it is true that Plaintiff has consistently complained of musculoskeletal pain and arthritis, and has received varying courses of treatment for those complaints, the objective clinical evidence fails to establish the existence of any medical impairment which could reasonably be expected to have more than a minimal effect on Plaintiff's ability to perform basic work activities, as explained more fully below.

Starting with his first visit with Shara Peets, M.D., on January 5, 1999, and continuing through his treatment relationship, Groff complained of pain radiating throughout his entire body. Clinical findings and diagnostic tests, however, failed to yield an explanation for this pain. At one particular

visit, on June 10, 1999, Dr. Peets noted that despite Plaintiff's complaints of pain, his x-rays were essentially normal. *See* Tr. at pp. 127. Radiology reports of Groff's hands and right knee also came back within normal limits with <u>no</u> evidence of arthritis. *Id*. at pp. 140 (hands) & 165 (right knee). Despite Plaintiff's constant complaints of pain, no other laboratory tests are included in the record. Furthermore, though Dr. Peets continually noted musculoskeletal pain as Groff's primary complaint, she prescribed relatively conservative courses of treatment, such as pain medication, physical therapy, and referral to a pain clinic. *See generally id* at pp. 116-29. Dr. Peets often noted that upon examination, Plaintiff did not appear to be in acute distress. *Id*. at pp. 120-23 & 125-26. At no point did she refer him to any specialist regarding his musculoskeletal pain nor assess a specific diagnosis for the pain. Similarly, at the consultive examination with Kalyani Ganesh, M.D., though Groff reported a history of arthritis in all of his joints, including his hands, wrists, shoulders, neck, and right knee, upon examination, Groff exhibited full flexion, full range of motion, and full strength throughout his entire body. *Id*. at pp. 190-93. Indeed, it would appear that the genesis of this pain, in light of the negative clinical findings, is unknown, and no course of action beyond the conservative treatment mentioned above has been pursued.[8] Thus, the objective medical evidence substantially supports the ALJ's determination that Plaintiff's complaints of arthritis and/or musculoskeletal pain does not constitute a severe impairment. Notably, though this impairment was not considered to be severe at

---

[8] At one particular visit, Groff expressed frustration with the fact that he feels so much pain and cracking of his bones, yet his tests are within normal limits. Tr. at p. 127. In response, Dr. Peets counseled Groff by assuring him that what he mistakenly presumes are his bones "cracking" may actually be tendons snapping over the bone and that just because x-rays are negative doesn't mean that he does not feel discomfort. *Id*. Finding that Groff's muskuloskeletal pain is not a "medically determinable" impairment does not foreclose the possibility that Groff experiences pain. Disability, however, requires more than mere inability to work without pain. *Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d Cir. 1983) ("To be disabling, pain must be so severe, by itself or in conjunction with other impairments, as to preclude any substantial gainful employment."). The Regulations provide that a "physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms." 20 C.F.R. § 416.908. The record simply would not support any contention that Groff's muskuloskeletal pain is, by itself, disabling.

Step Two, the ALJ continually considered the effect of this non-severe impairment throughout the balance of the sequential analysis.  Accordingly, no error occurred with this determination.

The same cannot be said of the ALJ's severity assessment of Groff's migraine headaches.  The ALJ recounted Groff's testimony regarding his history of migraines, including past hospitalization, as well as Groff's description of the physical toll he experiences during a migraine episode, which Groff asserted recur approximately twice a week.  Tr. at pp. 14-15.  The ALJ noted, however, that despite these subjective complaints, "except for a notation of a Metoclopramide refill on December 1, 2003, neither Dr. Peets nor any other treating medical source has indicated any specific evaluation or treatment for migraine or cluster headaches, or attributed any loss of smell, sight, or other bodily functions to such headaches, or assessed any specific work-related functional limitations from such headaches."  *Id*.  Based upon this explanation, the ALJ found that Groff failed to establish "any medically determinable and 'severe' headache impairment causing more than minimal work-related functional limitations."  *Id*. at p. 15.

With this determination the ALJ not only provides an incorrect recitation of the medical record, but also evinces an erroneous understanding of the nature of migraine headaches and the treatment of such condition.  In failing to comprehend the potential elusiveness of this impairment, the ALJ erroneously concluded that there was an absence of a medically determinable impairment.  And, the ALJ seemingly elected not to consider Groff's subjective symptoms and the limiting effects therewith.  This determination is in direct contravention with Dr. Peets' diagnosis and treatment of Groff's migraines.

According to the medical record, Plaintiff has endured migraines and cluster headaches since approximately age eleven.  *Id*. at p. 129.  At the initial appointment with Dr. Peets, Groff complained

of joint pain and migraines. *Id*. As part of his family history, Groff relayed that, among other things, his grandmother suffered from migraines. *Id.* Plaintiff further relayed to Dr. Peets that he had been treated by other doctors who prescribed Imitrex injections, which lost its effectiveness over time, as well as physical therapy and wearing a TENS unit for his pain, but these latter treatments only made his migraines worse. *Id.* at p. 128. In response to complaints of pain and stiffness in his hands and fingers, which Groff claimed worsened in adverse weather, Dr. Peets prescribed Relafen, a nonsteroidal anti-inflammatory drug (NSAID) and further recommended a physical therapy evaluation. *Id.* at pp. 128-29. Thereafter, Groff missed his March 11, 1999 appointment with Dr. Peets due to a migraine. *Id*.

At a follow-up appointment with Dr. Peets on June 28, 1999, Groff reported chronic headaches in the morning, which he initially attributed to the Relafen, however, he had no relief from the recurrent headaches after discontinuing that medication. *Id*. at p. 126. Groff further informed Dr. Peets that he had previously been prescribed Metoclopramide but it made him irritable and drowsy. *Id*. In response, Dr. Peets provided Groff with a trial of Depakote for treatment of his migraines. *Id*.

Because of his complaints of overall pain, on July 13, 1999, Groff was evaluated at Samaritan Medical Center Department of Physical Therapy. It was reported to Dr. Peets that Plaintiff was determined a good candidate for referral to pain management. *Id*. On July 26, 1999, Dr. Peets ruminated over whether Plaintiff's neck pain contributes to his headaches. *Id*. at p. 125. Groff described a severe neck pain, followed by a migraine-like headache with photophobia and phonophobia (sensitivity to light and sound, respectively), and that the medications were not helpful. *Id*. Dr. Peets discontinued the Relafen and Depakote, prescribed Flexeril and Darvocet, and referred Groff to pain management. *Id*. On May 8, 2000, Plaintiff began receiving trigger point injections at the pain clinic,

*-12-*

which provided some initial relief with his headaches, though he continued to suffer pain and muscle tightness; by August 10, 2000, Plaintiff questioned whether the treatment from the pain clinic truly helped his condition. *Id*. at pp. 122-23. On April 19, 2004, Dr. Peets stated, *inter alia*, that in light of Plaintiff's medical history, his headaches are disabling as often as twice a week and render him unemployable. *Id*. at p. 223.

At the consultive examination with Kalyani Ganesh, M.D., Groff relayed his history of migraines and further described the effect the migraines have on him. *Id*. at p. 190. According to Dr. Ganesh's notes, Groff explained that a headache will start at the back of his head and shoot over to the top. *Id*. During an episode, he loses his vision, except for tunnel vision, everything smells offensively, he has phonophobia, and loses control of his bodily systems. *Id*. He asserted that he gets a headache once a week or once every two to three weeks, and it usually lasts for days. *Id*. at p. 191. For treatment, he would take Metoclopramide at the onset of a headache, which slows down the headache. *Id*. at p. 190. Similarly, at the ALJ Hearing, Plaintiff testified that, on average, he suffers from migraines every two weeks, with each migraine lasting two to three days at a time. He further testified that during a particular migraine episode, he experiences tunnel vision, dulled senses of smell and taste, vomiting, and loss of control of other bodily functions. *Id*. at pp. 34 & 36-37.

In light of the above, it is clear that the ALJ's assertion regarding the extent of treatment prescribed for Groff's migraines is patently erroneous. Indeed, varying courses of treatment were prescribed for Plaintiff's complaints of migraines. Any other conclusion could only result from a disregard of the medical evidence. Furthermore, to place such emphasis on the absence of "any specific evaluation or treatment" is not only a misstatement of the medical evidence, but is also a misreckoning of the elusive task a doctor faces in diagnosing this impairment as there exists no objective clinical test

which can corroborate the existence of migraines.  Indeed, according to one medical treatise,

> [t]he cause [of a migraine] is unknown and the pathophysiology is not fully understood.
> . . . The mechanism for migraines is not well defined, but several triggers are
> recognized[, including] insomnia, barometric pressure change, and hunger. . . .
> Symptoms usually follow a pattern in each patient . . . . The patient may have attacks
> daily or only once every several months.  Diagnosis is based on the symptom patterns
> when there is no evidence of intracranial pathologic changes.  Migraine is more
> probable when the patient has a family history of migraine . . . . No diagnostic tests are
> useful, except to exclude other causes.  Treatment depends on the frequency of attacks
> and the presence of comorbid illness.  In general, treatment can be classified as
> prophylactic, abortive, or analgesic.

*The Merck Manual* 1376 (17th ed. 1999).

Prophylactic treatment is recommended when a person has one migraine a week, abortive treatment is

prescribed for acute treatment, and analgesics are recommended only sparingly for use with only mild

to moderate headaches.  *Id*. at 1376-77.  The prescribing of Metoclopramide falls under the "abortive"

treatment classification.  *Id*. at 1377, Table 168-2.  A diagnosis of migraines is dependent upon the

patient's description of symptom patterns and the ruling out of other conditions.  Dr. Peets consistently

diagnosed Plaintiff with a migraine condition and treated him for such.  Accordingly, the ALJ erred at

Step Two when he determined the absence of a medically determinable severe impairment and, in turn,

failed to consider Plaintiff's subjective complaints.[9]  *Federman v. Chater*, 1996 WL 107291, at *2

(S.D.N.Y. Mar. 11, 1996) (citing cases to support the court's remand based upon the ALJ's erroneous

reliance on the absence of objective evidence in assessing whether the claimant's migraines were

medically determinable).

---

[9] While Plaintiff believes there exists a link between his muskuloskeletal pain and the onset of his migraines, we
note that no inconsistency ensues with our finding of ALJ error with regard to the migraine severity assessment but not the
arthritis.  Indeed, the basis for the ALJ's error as to the severity of the migraines is the ALJ's gross misstatement of the
medical evidence as well as the ALJ's inappropriate reliance on the absence of objective evidence of the condition as there
appears to be no set test which can establish the existence of this condition.  The same errors did not occur with Groff's
complaints of muskuloskeletal pain or arthritis as there are tests in existence that can corroborate the existence of such
condition and the limited tests that were used in Groff's treatment reflected no abnormalities.

### *b. RFC*

In assessing Groff's RFC, we find that the ALJ failed to apply the correct legal principles when he accorded no great weight to Dr. Peets' opinions and instead deferred to the opinion of one-time examining consultant Dr. Ganesh.  The ALJ's erroneous RFC assessment necessarily tainted any determination made at Step Five as to whether Plaintiff could perform work available in the national economy, not the least of which may have been an improper reliance on the Grids to find Plaintiff "not disabled."

The Regulations require the Commissioner to assess a claimant's RFC as a basis for determining the particular types of work the claimant can perform despite the existence of physical and/or mental impairments.  *See* 20 C.F.R. § 416.945; 20 C.F.R. Part 404, Subpart P, App. 2, § 200.00(c); *see also supra* note 5.  The ALJ can consider a variety of factors in determining a claimant's RFC including a treating physician's or examining physician's medical opinions or observations of limitations, the plaintiff's subjective allegations of pain, physical and mental abilities, as well as the limiting effects of all impairments even those not deemed severe.  20 C.F.R. § 416.945(a).

The ALJ determined Groff had the following RFC:

> [Groff] has no limitation on sitting, standing, and the use of his upper extremities, and he has a moderate degree of limitation on walking, climbing, lifting, carrying, pushing, pulling, and rapid-paced activity; however, he has no other significant work-related functional limitations.

Tr. at p. 20.

This determination was based solely on Dr. Ganesh's findings, whom the ALJ posits as "the only treating and/or examining physician who has offered for the record a specific statement regarding the extent of [Groff's] work-related functional capacities and limitations."  *Id*. at p. 18.  This statement, however, is not entirely correct as there exists at least two other individuals who have provided

opinions regarding Groff's work-related functional capacities limitations.  The first opinion comes from

J. Koncak, a state agency disability examiner, while the second is provided by Groff's Treating

Physician, Dr. Peets.  While the ALJ may, in his discretion, not afford significant weight to the former

opinion, his disregard of the latter was in error.

    According to the Regulations, an ALJ will consider RFC assessments made by state agency

medical consultants regarding a claimant's ability to do work-related activities such as "sitting,

standing, walking, lifting, carrying, handling objects, hearing, speaking, and traveling" as opinion

evidence.  20 C.F.R. §§ 416.913(c) & 416.927(f); *see also* S.S.R. 96-6p, 1996 WL 374180, at *2 & 3,

*Policy Interpretation Ruling Titles II and XVI: Consideration of Administrative Findings of Fact by*

*State Agency Medical and Psychological Consultants and Other Program Physicians and Psychologists*

*at the Administrative Law Judge and Appeals Council Levels of Administration Review; Medical*

*Equivalence* (S.S.A. 1996).  J. Koncak, a state agency medical consultant, reviewed the entire record

and assessed a more inclusive RFC than Dr. Ganesh, or rather, touched upon certain limitations not

discussed by Dr. Ganesh.  *Id*. at pp. 194-97.  Specifically, J. Koncak assessed Groff could occasionally

lift and/or carry ten pounds, frequently lift/and or carry less than ten pounds, stand and/or walk at least

two hours in an eight-hour workday, sit about six hours in an eight-hour workday, and had no

limitations in his ability to push and/or pull, other than as shown for lifting and carrying.  Tr. at p. 195.

Groff's emphysema, which the ALJ determined constituted a severe impairment, and medical records

associated therewith, formed the basis for these limitations.  Furthermore, Groff was assessed to have

postural limitations in that he should never climb, kneel, crouch, or crawl, and should only occasionally

balance and stoop.  *Id*. at p. 196.  No manipulative, visual, nor communicative limitations were noted.

*Id*. at pp. 196-97.  However, environmental limitations were noted in that Groff should avoid

concentrated exposure to extreme cold, noise, vibration, and hazards and avoid even moderate exposure to extreme heat, wetness, and humidity. *Id*. at p. 197. J. Koncak further stated that Groff should "avoid environmental exacerbants [due] to his underlying pulmonary disease and arthritis joint pain." *Id*. Notably, Groff's subjective complaints of breathing difficulty with mild exertional activity were deemed credible in light of the medically determinable COPD impairment. *Id*. at p. 198.

The primary basis provided by the ALJ in rejecting this RFC assessment is because Koncak considered Groff's arthritis to be a severe impairment, which the ALJ rejected. Apparently the ALJ felt that the inclusion of this impairment in the RFC consideration tainted the entire assessment. *Id*. at p. 17. Yet again, the ALJ misstates the record. In fact, much of Koncak's RFC assessment is based upon the medical evidence with regard to Groff's COPD. Koncak's consideration of the impact of Groff's other impairments on his capability to do work-related functions, whether or not such impairments are severe, was proper under the Regulations. 20 C.F.R. § 416.945(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not "severe," . . . when we assess your residual functional capacity."). In fact, in rendering his own RFC assessment, the ALJ acknowledges this obligation to consider the limiting effects of all impairments, even those not deemed severe. Tr. at p. 15. Thus, to discount the state agency opinion on this basis is an incorrect application of the law. To further support his disregard of the state agency opinion, the ALJ suggests it is inconsistent with Dr. Ganesh's medical statement. *Id*. at p. 17. This is not entirely correct as it appears that Dr. Ganesh simply did not address Groff's RFC in the same terms nor to the specificity that the agency examiner did. And, the agency consultant specifically acknowledged and adopted Dr. Ganesh's limitations.

Of primary concern to this Court, however, is not so much the treatment accorded to the agency

consultant's opinion, but rather, the ALJ's treatment of Dr. Peets' assessment.  Dr. Peets, whose

treatment relationship with Plaintiff dates back to 1999, submitted the following statement, dated April

19, 2004:

> Mr. Groff has a history of COPD, migraine headaches and chronic neck pain.  He notes
> history of neck injury at age 11.  He has been evaluated by Pain Treatment Centers,
> Orthopedic and Rheumatology Specialists.  He has a history of ongoing migraine and
> cluster headaches.  He has a history of COPD.
>
> He complains of symptoms of shortness of breath with minor activity such as dressing
> or recreational activities.  He has his disabling headaches approximately twice a week.
>
> He is not considered to be employable at this time due to his symptoms of dyspnea on
> exertion, recurrent migraine, and persistent neck pain.

*Id*. at p. 223.

In considering the weight to be provided to Dr. Peets' April 19, 2004 Statement, the ALJ stated he was

not affording "any great weight" for several reasons.  First, the ALJ found her statement to be

conclusory on the issue of disability, a matter specifically reserved to the Commissioner.  *Id*. at p. 16

(citing S.S.R. 96-5p, 1996 WL 374183, *Policy Intrepretation Ruling Title II and XVI: Medical Source*

*Opinions on Issues Reserved to the Commissioner* (S.S.A. 1996)).  Second, the ALJ noted that Dr. Peets

described "no specific work-related functional limitations, and [instead] explains the claimant's lack

of 'employability' on the basis of 'symptoms' rather than clinical or laboratory diagnostic findings."

*Id*.  Finally, the ALJ reinforces his earlier ruling of non-severity with regard to Groff's complaints of

arthritis and migraines, and discounts Dr. Peets' opinion inasmuch as such impairments constituted a

basis therewith.  *Id*.  The ALJ's discounting of Dr. Peets' opinion was in error.

When reviewing all medical opinions and assessing what weight to accord, "[t]he duration of

a patient-physician relationship, the reasoning accompanying the opinion, the opinion's consistency

with other evidence, and the physician's specialization or lack thereof" are considerations.  *Schisler v.*

*Sullivan*, 3 F.3d at 568; 20 C.F.R. § 416.927(d)(1)-(6); *see also Schaal v. Apfel*, 134 F.3d 496 (2d Cir. 1998).  The ALJ must properly state the reasons for giving less than controlling weight to a treating physician's opinion.  20 C.F.R. § 416.927(d)(2); *Halloran v. Barnhart*, 362 F.3d at 32.   Failure to apply the appropriate legal standards for considering a treating physician's opinion is a proper basis for reversal and remand, as is the failure to provide reasons for rejection of a treating physician's opinion.  *Johnson v. Bowen*, 817 F.2d 983, 985-86 (2d Cir. 1987); *see also Barnett v. Apfel*, 13 F. Supp. 2d at 316-17.

In analyzing a treating physician's opinion, "the ALJ cannot arbitrarily substitute his [or her] own judgment for competent medical opinion." *McBrayer v. Sec'y of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983); *see also Balsamo v. Chater*, 142 F.3d 75, 80-81 (2d Cir. 1998).  "A treating physician's statement that the claimant is disabled cannot itself be determinative[]" for that is an issue solely withing the Commissioner's province.  *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); *see also* 20 C.F.R. § 416.927(e)(1) (Commissioner provides the ultimate decision on disability).  That does not mean, however, that an ALJ may disregard a treating physician's opinion with regard to matters reserved to the Commissioner.  In fact, according to S.S.R. 96-5p, which is the Ruling relied upon by the ALJ in Groff's case, "opinions from any medical source on issues reserved to the Commissioner **must never be ignored**."  S.S.R. 96-5p, 1996 WL 374183, at *3 (emphasis added).  Instead, such opinion must be evaluated in the context of the entire medical evidence.  *Id.*  Furthermore, "if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator **must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion**."  *Id.* at *6 (emphasis added).  Therefore, necessarily subsumed into the ALJ's affirmative duty

to develop the record is the requirement that the ALJ clarify a treating physician's opinion that a claimant is unable to work. *See Hartnett v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998) ("[I]f an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly.") (citing, *inter alia*, *Clark v. Comm'r of Soc. Servs.*, 143 F.3d 115, 118 (2d Cir. 1998) and further quoted in *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999)). Thus, to the extent the ALJ was unclear as to the basis for Dr. Peets' April 2004 assessment, he had the affirmative duty to seek clarification from Dr. Peets. *See* 20 C.F.R. § 416.912(e)(1) (noting that the SSA will seek additional evidence or clarification from a treating physician when there exists within a report "a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques[]"); *see also Pilch v. Apfel*, 2000 WL 565101, at *5-6 (D. Conn. Mar. 29, 2000) (citing cases for the proposition that an ALJ may not reject a treating physician's diagnosis of complete disability without first re-contacting the physician for clarification). His failure to adequately develop the record in this regard is grounds for a remand. *Tornatore v. Barnhart*, 2006 WL 3714649, at *3-4 (S.D.N.Y. Dec. 12, 2006) (citing cases and remanding matter due to, *inter alia*, the ALJ's failure to develop the record by re-contacting the treating physician for clarification); *Hinds v. Barnhart*, 2004 WL 1342766, at *9-10 (E.D.N.Y. Apr. 18, 2005) (remanding case where ALJ failed to request additional information from treating physician to clarify opinion).

Because the ALJ did not have a complete medical record, he was necessarily limited in his ability to properly assess Plaintiff's RFC. *See Gray v. Astrue*, 2007 WL 2874049, at *7-8 (S.D.N.Y. Oct. 3, 2007). Thus, we cannot determine whether the ALJ's RFC is supported by substantial evidence

without further development of the evidence.

### E.  Reversal or Remand

Because of the errors committed by the ALJ at Step Two and because of his inadequate RFC determination, we cannot complete our review of Steps Four and Five, as any determinations beyond the RFC were necessarily tainted.  The court is vested with the authority to either affirm, reverse, or modify a final decision of the Commissioner with or without remand.  *See* 42 U.S.C. § 405(g); *Butts v. Barnhart*, 388 F.3d 377, 385 (2d Cir. 2004); *Verginio v. Apfel*, 1998 WL 743706, at *2 (N.D.N.Y. Oct. 23, 1998).  Remand is appropriate when, as in this case, there are gaps in the record, further development of the evidence is needed, or where the ALJ has applied an improper legal standard.  *See Butts v. Barnhart*, 388 F.3d at 385; *Rosa v. Callahan,* 168 F.3d at 82-83; *Parker v. Harris,* 626 F.2d 225, 235 (2d Cir. 1980); *Verginio v. Apfel*, 1998 WL 743706, at *2.  Furthermore, remand is warranted if "further findings or explanation will clarify the rationale for the ALJ's decision."  *Steficek v. Barnhart*, 462 F. Supp. 2d 415, 418 (W.D.N.Y. 2006) (citing *Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir. 1996)).

### III.  CONCLUSION

In light of the foregoing discussion, it is hereby

**RECOMMENDED**, that the Commissioner's decision denying SSI benefits be **VACATED AND REMANDED** for further proceedings pursuant to sentence four of  42 U.S.C. § 405(g); and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written

objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE**

**APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), & 6(e).

Date:   August 18, 2008
          Albany, New York

_____
RANDOLPH F. TREECE
United States Magistrate Judge